KELLEY, Respondent, v. CHICAGO & ALTON RAILWAY COMPANY, Appellant.

St. Louis Court of Appeals, March 1, 1904.

1. **MASTER AND SERVANT: Safe Appliances: Proof of Negligence.** In an action by an employee against his employer for injuries which have resulted from the plaintiff's being put in an unsafe place to work, or being provided with unsafe tools, unless the accident carries on its face proof of negligence on the part of the employer, proof of the facts constituting his negligence must be produced in order to make him responsible for the injury.

2. ———: ———: **Notice.** It is an essential element of negligence on the part of the employer in such a case that he had knowledge of the defect complained of, or such an opportunity to know as to be the equivalent of knowledge.

3. ———: ———: **Duty of Servant.** It is the duty of a servant who has been put in charge of defective appliances, with notice that they are defective, to give proper notice to his employer, of the defect and make a request for proper appliances, and if, after sufficient opportunity he fails to give such notice and make such request, he can not recover for injuries caused by such defective appliances.

4. ———: **Assumption of Risk.** An employee assumes the risk naturally incident to his occupation, including the risk of injury from defective machinery, after the master has used ordinary care and reasonable diligence to furnish safe machinery and to keep it safe, and especially the risk incident to his (the servant's) own neglect.

Appeal from Audrain Circuit Court.—*Hon. E. M. Hughes*, Judge.

REVERSED.

*F. Houston* and *C. C. Madison* for appellant.

(1)   In the light of plaintiff's admission and the undisputed evidence, he is precluded from a right to recover in this action and in such circumstances it was the plain duty of the trial court to direct a verdict for defendant.   Feary v. Railroad, 162 Mo. 105; Holmes v. Leadbetter, 95 Mo. App. 419; Spooner v. Railroad, 23 Mo. App. 411.   Plaintiff's testimony shows that his injuries were not produced by any act of negligence of defendant, but were due to an accident or peril of the employment well known to plaintiff, and the danger of being so injured was assumed by plaintiff.   Wendall v. Railway, 75 S. W. 689; Cunningham v. Journal Co., 95 Mo. App. 47; Lectior v. Grieb, No. 5417, K. C. Ct. of Appeals, Nov. 9, 1903; Holt v. Railway, 84 Mo. App. 443; Beasley v. Transfer Co., 148 Mo. 413; Pavy v. Railroad, 85 Mo. App. 218; Steinhauser v. Spraull, 127 Mo. 541; Fugler v. Bothe, 117 Mo. 475; Marshall v. Hay Press Co., 69 Mo. App. 256; Bohn v. Railroad, 106 Mo. 429; Howard v. Railway, 173 Mo. 524.

(2)   The court erred in giving plaintiff's instruction No. 1.   Said instruction is too narrow in that it ignores the question of whether defendant had knowledge, or a reasonable opportunity of knowledge, of the risks and defects in time to have repaired them, and imposes an absolute duty to furnish safe appliances.   Hester v. Dold Packing Co., 84 Mo. App. 451; Zellars v. Water & Light Co., 92 Mo. App. 107; Herbert v. Boot & Shoe Co., 90 Mo. App. 305.   (3)   The court erred in giving plaintiff's instruction No. 2.   Like the first instruction it erroneously tells the jury that defendant

was bound to furnish reasonably safe appliances and a reasonably safe place in which to work at all events and that plaintiff did not assume such risks; also stated the rule of contributory negligence incorrectly. Shea v. Railway, 76 Mo. App. 29; Bradley v. Railway, 138 Mo. 293; Neugent v. Milling Co., 131 Mo. 241.

*George Robertson* for respondent.

(1) Under the testimony submitted the plaintiff was entitled to recover and plaintiff's instructions 1 and 2, were properly declared the law. Booth v. Railway, 76 Mo. App. 516; Bradley v. Railroad, 138 Mo. 293; Hamman v. Coal & Coke Co., 156 Mo. 232; Cardwell v. Railway, 90 Mo. App. 31; Nash v. Dowling, 93 Mo. App. 156; Curtis v. McNair, 173 Mo. 270; Henderson v. Kansas City, 76 S. W. 1045; Renfro v. Railroad, 86 Mo. 302; Moore v. St. Louis Wire Mill Co., 55 Mo. App. 491; Porter v. Railway, 71 Mo. 66; Condon v. Railroad, 78 Mo. 567. (2) Contributory negligence is an affirmative defense and must be established by the evidence. The burthen is upon the defendant to establish it. Hudson v. Railway, 32 Mo. App. 667; Mitchell v. City of Clinton, 99 Mo. 153; Thompson v. Railway, 65 Mo. 34.

STATEMENT.

Action for damages on account of an injury received by the respondent because of alleged negligence on the part of the appellant. The defenses pleaded consisted of a denial of the negligent conduct charged, a special plea of contributory negligence, in which it is averred that the defective appliances complained of by the respondent were in his charge, and if they were out of repair it was his duty to repair them, or procure others; and the defense that the injury resulted from a danger incident to respondent's employment and due to the condition of the appliances he was working with and of which, therefore he assumed the risk.

Kelly, the plaintiff, engaged to work for the appel-

Kelley v. Railroad.

lant railway company as a locomotive fireman, in September, 1902, having previously had three years experience in that vocation. The alleged accident in which he was hurt occurred on his second run, which began on the evening of September 22d, at half past eleven or twelve o'clock. He was called at six o'clock and put on an engine (No. 305) to run from Slater to Kansas City. The train was not made up, however, until later and at the hour first mentioned. Meanwhile, from six o'clock until the train started, Kelly stayed on the engine and observed the conditions under which he would have to work and the appliances he would have to work with. He said he got a fall while on the trip and in consequence received the injury for which he sues. The petition avers the fall was due to the negligence of the company in furnishing defective and leaking hand oilers, lamps and torches, from which the oil would drip on the floor of the engine cab, making it slippery, and soaking into the shoes of the operatives on the engine; that in consequence of the slippery condition of the floor and of his shoes, due to the leaking oil, and in consequence, too, of the lights going out because the lamps would not hold oil, he struck one foot against an obstacle, the other foot slipped on the floor and he fell on a hard substance and was hurt. We will reproduce later the respondent's narration or the circumstances of the accident, but before doing so will state what he said about the condition of the engine cab and the appliances therein. Kelly swore that over the steam-gauge and the water-gauge were two small lamps, intended exclusively to illuminate those gauges; that there should be in an engine two red and white lanterns to signal with and two torches, one for the engineer and one for the fireman. He found those appliances and utensils there, but, he said the steam-gauge lanterns, torches and some oilers were leaking. He said, too, it was the duty of the fireman to keep the lamps filled with oil and all the appliances in good condition. As to the torches his statement was

that they were packed in a box on the front of the tender until needed for use. Those torches and other lights leaked so much, he said, that they had to be frequently filled and it was hard to keep them burning. He testified that oil dripped from several vessels and spread over the floor of the cab, greasing it and making his shoes so slippery that it was impossible to stand with safety on the floor of the cab. He discovered the leaky condition of the torches before leaving Slater. The fall occurred at Higginsville, forty miles from there, while the engine was standing on a side track to let another train pass; in which contingency the headlight of the stationary engine must be hooded or covered. It was the fireman's duty to do this; and in order to do it Kelly lighted a torch, went over the box-seat on the left hand side of the cab, through the cab window, walked along the running-board to the front of the engine and covered the light. When the train was ready to start he repeated the trip, to unhood the headlight and, as he was returning, the torch went out; he said, because all the oil had escaped from it. This left him in the dark and as he entered the cab he struck his foot against the box-seat, stumbled, his other foot slipped on the greasy floor, he fell and was hurt. We will quote his version of the accident as it appears in several parts of the testimony.

"Q. How far did you go before anything happened? A. Higginsville.

"Q. How far is that west of Slater? A. As it was my first trip on the west end I couldn't really say.

"Q. What was necessary for you to do there? A. When we turn out to meet another train, according to the book of rules, we have to cover the headlight, and when it passes, uncover it, and I covered it.

"Q. Did the engine turn on the side track there? A. Yes, sir.

"Q. What did you do? A. I covered my headlight.

"Q. Explain how you went around there and how you came back? A. There's a running-board on the outside of the engine going to the headlight and I went out the running-board.

"Q. That is to walk around to the headlight? A. That's what it's for.

"Q. How did you get out? A. I walked out on the running-board.

"Q. You don't walk out that cab? A. There's a little window by the fireman's seat-box and it was raining and I had it closed, and I opened the window and walked out over the running-board and took my torch as there were pipes along there, I took it and covered the headlight.

"Q. Where did you go in the engine? How did you get back into the engine? A. I went back the way I came, over the running-board, and I stepped down on the box-seat.

"Q. Well, what happened to your torch while you was out there? A. It went out.

"Q. Why did it go out? A. For want of oil.

"Q. It had all run out? A. Yes, sir.

"Q. When you came back into the engine did you have any light? A. No, sir.

"Q. What happened when you came back into the engine? A. When I came back into the engine that time I sat down on the seat-box as I had nothing else to do; I had covered the headlight and the other train hadn't shown up, and I sat down until time to go out and uncover it.

"Q. Did you have to put in any oil? A. Not then, not until we was ready to start out; then, when the other train passed us I was ready to start out; I walked out and uncovered my headlight and walked back and had to step over the seat-box to put in a fire; I had to carry a very hot fire, which called me to put one in as soon as we started; in going back *without a light* my toe caught on the seat-box and my other foot slipped out from under

me like that, and I fell down in the deck with my head and shoulders in the tank and my left groin on the apron and from the way I fell it appeared I fell on some loose coal that fell down; naturally rolls down.

"Q. Where did it injure you? A. In the left groin, right in there."

On cross-examination, Kelly testified as follows:

"Q. What was it you knocked your toe on? A. My seat-box; the seat-box which we sit on; the little box we sit on called the box-seat.

"Q. What was it caused you to fall? A. When I opened this door that goes in from the running-board there's a little space there of about that distance and then my seat-box sets on a level with that, about a foot or fourteen inches high and about two feet long, maybe a little longer; I have to step over that; most of the engines have a little space; the seat-box moves back and you can put your foot in between like that; but this box-seat was jammed against the boiler-head and the only way to get over it was to step over it and *in doing it my torch went out and my toe caught about this much;* I fell or stepped over like that, and this foot slipped from under me and I went headlong down with my head and shoulders in where the coal goes and my feet towards the coal door and my left groin on that place between the engine and tank.

"Q. How long had the light been out? A. It went out while I was out there.

"Q. Before you fell? A. It went out while I was out; I lit it and went out there and it went out between the head end of the engine and the cab; it was raining.

"Q. What caused you to fall was knocking your toe? A. I didn't get my foot high enough; didn't raise it high enough; couldn't see to; and my other foot naturally would come out from under me quicker than it would if it was dry, I suppose.

"Q.   Then oil on the floor had nothing to do with causing you to stump your toe?   A.   No, but the oil on that sole—probably if the oil hadn't been on the sole I would have had good foothold enough to catch myself; but as soon as that come the rest of my foot went so slick, it went out from under me and made me fall quicker; if I hadn't had the oil I would have fallen slower and had an opportunity to grab something.

"Q.   If you hadn't stumped your toe you wouldn't have fallen?   A.   No, sir, I suppose not, unless I had fallen later on.

"Q.   At the time you did fall, though?   A.   No, sir, at the present time, no, sir, I wouldn't have fallen then.

"Q.   It wasn't the slippery condition of the floor that really caused you to fall, it was knocking your foot as I understand?   A.   If the floor had not been in a slick condition I wouldn't have got the grease on my shoe.

"Q.   But it was knocking your toe that caused you to fall down, wasn't it?   A.   Yes, sir; I presume it was.

"Q.   What I want to find out is, I want to know whether it was because of your stumbling and knocking your foot against some object that caused you to fall, or whether it was because you slipped?   A.   I have said before that it did."

Kelly testified in regard to the condition of the torch before the trip began as follows:

"Q.   That was the steam-gauge lamp that leaked? A.   Yes, sir.

"Q.   What other lamp leaked?   A.   The torches leaked.

"Q.   What are the torches?   A.   Those you carry around the engine when you are oiling; little cans about an inch and a half at the top and about three at the bottom.

"Q.   You don't mean what people commonly call a torch blazing?   A.   Yes, sir, a piece of wick; it looks

like a little ten cent tea pot with a piece of wick running out to light by; there's a light about that big.

"Q. When did you first discover it was leaking? A. Well, before we left."

The torches were not lighted except as needed; nor was any light kept in the engine for illuminating purposes, except those used to throw light on the gauges, as appears from the following testimony of the respondent:

"Q. Wasn't there a little white light, ordinary hand lantern, sitting in the cab? A. That is the one I went over to draw; I went over to draw supplies and they told me I didn't have any, I started to call for a requisition and they told me they didn't have them; I made the remark, 'There might some accident happen, and you had better look around a little closer and see if you can find something.'

"Q. What made you think an accident might happen? A. You are always subject to accident on a railroad.

"Q. What connection was there between that and the light? A. In case an accident happened.

"Q. What sort of accident? A. You might break in two, a rail break or any kind of accident that would happen.

"Q. Did you want it in the cab of your engine to light the engine? A. You are supposed to keep them lit in case of an accident that you have to go ahead and flag.

"Q. I asked you, did you use a light of that sort in the cab of the engine, for lighting the cab of the engine. A. No, sir I used the torch; I am not supposed to use them at all; I am supposed to keep them lit in case of an accident.

"Q. Did you keep the torches lit in the engine all the time. A. Not the torches, no, sir; but the lights you have reference to I did.

"Q. You said there were five torches? A. No, five hand oilers on it.

"Q. How many torches? A Two.

"Q. How many of those torches were lit during the five hours between the time you got on the engine? A. We only light them in case we need to look at anything; we don't keep them lit.

"Q. In other words, you don't keep any lights in the cab? A. Nothing but the white and red light to flag by and they are kept there all the time for that business.

"Q. You don't keep them to light the cab? A. No, sir; not as I understand the regulations; there's not supposed to be any light on the cab when running.

"Q. You received a copy of the rules and regulations when you went into the employment? A. Yes, sir.

"Q. And read them? A. Yes, sir; read certain parts of them presented to me, like any of the rest of them.

"Q. Well, what I want to get at, these two lamps were not kept there for the purpose of lighting the cab when running?"

Although the plaintiff said he was severely hurt by the fall, he never mentioned it to any one on the run, but did complain of being sick. The engineer did not observe that he met with a fall during the trip; and another man who was in the engine likewise failed to observe the accident, and testified that it could not have happened without his observing it. Kelly made no report of the accident until sometime in November. According to the testimony of physicians there was a severe abscess in the groin, which could be attributed to such an accident as he describes.

Under the instructions given, the jury returned a verdict for the respondent for $1271, and the railway company appealed.

GOODE, J. (After stating the facts as above.) We have preferred to state this case largely in the language of the respondent in order to be sure to make a presentation that is fair to him, and will follow the same plan in further reference to the facts. Our copious transcriptions from his testimony show he attributes his fall and consequent injury to the torch-light failing for lack of oil, thereby causing him to stumble in the darkness over the seat-box, and to his footing being insecure because of the oil on the cab floor and on his shoes. It is plain that if the fall was not due to the respondent's own inadvertence, those circumstances caused it; and it becomes important to ascertain whether either or both of them can be traced, in the light of the evidence, to some neglect of duty by the railway company that would be the proximate cause of the injury. The two causal events resolve into one, namely: leaking oil vessels; and the essential inquiry is, was the railway company to blame for the locomotive having such defective vessels on the trip in question? It was, of course, incumbent on the company to exercise ordinary care to furnish torches that would retain oil and burn the usual time, and to keep the cab floor in a safe state for use by employees. This proposition is a corollary of the general doctrine that employers must be careful to provide employees a safe place to work and safe tools to work with. But an employer is not convicted of a breach of duty in this respect, by proof that an accident happens because of the defective tool or working place, except in instances when the occurrence itself speaks—that is when the accident carries proof of negligence on its face. Unless the negligence of a defendant is proclaimed as the proximate cause of a casualty by the very happening of it, proof that his negligence was the cause must be otherwise produced, to fasten responsibility on him; for a party who alleges negligence must establish it by one kind of proof or the other. Fuchs

v. St. Louis, 167 Mo. 620; Erwin v. Railroad, 94 Mo. App. 289; Schuler v. Railroad, 87 Mo. App. 618. An accident betokens negligence on the part of some person when it is of a kind that experience shows would not otherwise have happened. The facts of the present case do not call that rule of evidence into play, as men often stumble and fall without anyone's fault. The leaking vessels suggest negligence; but they do not demonstrate it; and if they did, the suggested negligence may or may not have lead to the respondent's fall. Besides, there comes up the question of whose negligence was responsible for the leaky state of the vessels, if it was due to negligence; a question we will take up later. Whether the railway company was to blame for their condition, depends on the degree of diligence it had used to keep the engine supplied with vessels in good order; and whether it was shown to be to blame so as to make it liable in this case for the respondent's injury, depends on the effect of the evidence as showing that it exercised or omitted reasonable efforts to supply good vessels. Reasonable efforts in this behalf would include inspection of the oil vessels at proper intervals, keeping the requisite quantity of those articles on hand, so that a defective one could be replaced, actual replacement as soon as its defective condition was known or ought to have been known, and perhaps other precautions. An essential element of negligence on the part of the appellant was knowledge that the oil tanks were out of order, or such an opportunity to know as is the legal equivalent of knowledge. Machinery and utensils will get out of repair from use; and now and then a mishap will occur from their being out of repair, before the fact is known or could be known by careful management. It is a just rule for the protection of employers that they are not responsible for a mishap thus caused. They must have known, or have had the opportunity to know, of the defect and have had, too, a chance to mend it, for

liability to attach.    Pavey v. Railroad, 85 Mo. App. 218;
3 Woods, Railways, sec. 373.

In Jones v. Yeager, 2 Dillon, 68, a very able judge
thus instructed a jury on this subject in a way that
clearly explained the law:

"The plaintiff's theory is, that the explosion was
caused by the defective boilers. What is the duty
towards employees of the owner of a steam engine and
boilers in respect to their safe condition? This is an
important question, and must be carefully answered.
The employer does not, impliedly, engage to insure his
servants that there shall be no accidents resulting from
the use of such machinery. Steam, which is a neces-
sary, if at the same time dangerous, power, and the
danger which attends the use of it, impose upon the
owner of machinery propelled by it certain duties and
obligations, and these are to use ordinary care and pru-
dence (the degree of which must be proportioned to the
danger) to have and to keep the boilers and machinery
in a safe and sound condition. If the employer knows
that his boilers are defective, or if under all the circum-
stances, as a reasonable man he should have discovered
though he did not, their defective condition, or if he neg-
ligently remained ignorant of their defective condition,
if the defective condition thereof was the direct and
proximate cause of an explosion which injured servants
who are blameless, and who did not contribute towards
the production of the accident by their own fault or neg-
lect, then the law is that the employer is liable to such
servants in a civil action for damages thus occasioned.

"In the application of these principles to the evi-
dence, you will first inquire whether the boilers in this
case were unsafe and unfit for use; and if so, whether
the defendant knew it, or as a reasonable man, having
due regard for the safety of his employees, ought to
have known it; for if he ought, his neglect in this respect
would be equivalent, in imposing liability, to actual
knowledge."

Such defects as escape attention because there is not time for the master to discover them by ordinary care, the servant takes the risk of as incident to his employment.

Now to establish that the appellant was in fault, two facts are relied on: that the vessels leaked, and that before starting on the run from Slater to Kansas City, the respondent asked the proper employee for others and none were furnished. The vessels leaked; but there is no testimony as to how long they had leaked, or that the officer or employee, whose duty it was to furnish others, knew, or ought in reason to have known, others were needed—in short, there is nothing to prove the company was remiss, except Kelly's notification and request at Slater. The duty of inspecting oil appliances about the engine, filling and keeping them in good order, was on him, he said. His testimony on that subject is as follows:

"Q. I will stop there and ask you what are the duties of a fireman? A. Well the duties of a fireman are to get around on the engine, fill his own oil, and see his lights are all filled and in good working condition, and get his fire ready and put out his signals and keep the engine hot until you get to its destination."

Now that Kelly detected the leaky state of the vessels before starting, and probably no one else could have detected it but the engineer, who was not charged with the duty of reporting, appears from the fact that Kelly filled the oil vessels, as was his duty. We quote again from his testimony:

"Q. How do you know that oil was there (on the floor)? A. I could feel it, and I could see it when we first started out in filling the hand oilers; I have to fill them in the deck.

"Q. When did you first see any oil on the floor? A. The first time I discovered it, I knew the hand oilers were leaking, and filling them the oil ran out at the bot-

tom while I filled them; I took a piece of waste and wiped it up.

"Q. Wiped it off the floor? A. Yes, sir."

The question of who was to blame for the engine having leaky oil vessels comes down then to the effect of what passed between Kelly and the supply agent at Slater. If Kelly gave notice of the defective appliances to which the accident was due, and requested good ones, he fully discharged his duty, and whatever blame attaches for the accident can not fall on him. On the contrary, if he did not give proper notice or make the proper request, so far as anybody is to blame for the consequences, he is; and his own fault is, of course, not available as a ground of recovery for his injury. When it is a servant's office to keep tools in repair and he carelessly fails to do so, the rule that a master must use care to furnish a servant with reasonably safe tools has no bearing on the case; for the reason that the servant's own dereliction prevented the discharge of the master's duty. Kleine v. Shoe Co., 91 Mo. App. 102; Allen v. Railroad, 37 S. W. 171; Carlson v. Railroad (Ore.), 28 Pac. 497. Now what notice did Kelly give the supply officer at Slater, and what request for perfect utensils did he prefer? Here is his testimony on that subject:

"They (the lanterns) were used as signals in case of wreck or any trouble.

"Q. And not for lighting the cab? A. No, sir; that's the way I understand it.

"Q. The truth is a light interferes with the engineer and it's not considered a good plan to have lights; it prevents him from seeing so well? A. I know the head brakeman rides in the engine, and you put it down so you can see to crack the coal; he may be there and may not; you are not supposed to have any lights, but you are supposed to have torches to go and clean the fire and oil the engine."

Kelly testified that he asked for some lamps or sig-

nal lanterns before starting from Slater, but could not get any; or rather that he got only a flag and a broken lantern.

"Q. What other lamps were there? A. Well, there was—I don't know of any other; I went over to get some but they failed to give them to me on the ground they didn't have any; *I went for a lantern* and they said they didn't have any—to flag up in case of accident, they says: 'We haven't any; we have been out of supplies *more or less* for two weeks. . . ."

"Q. Didn't you know, in doing this work, that it was a rule of the company that if you discovered anything out of order that it was your duty to report it? A. I done so, yes, sir; I understood it and done so.

"Q. Where did you make the report? A. You are supposed to make the report, that is, if there is anything missing in the line of *torches or lights,* there's a man in the yards, you report to him and he is to give it to you.

"Q. You did that at Slater? A. Yes, sir; and he failed to give them to me. He said they were out of supplies for some time; they were short.

"Q. And failing to get it you went out on the road without it? A. He did give me a piece.

"Q. Well, answer my question? A. I didn't fail to get everything; I got part of a lantern down stairs and part up and put it together.

"Q. And undertook to do your work with it? A. Yes, sir; my jurisdiction is to ask him.

"By the Court: What else did you demand of him but what you got, tell the jury? A. He didn't give me time to demand, when I started to tell him he says: 'I'm out.'

"Q. By the Court: Out of what? A. Supplies; he says we are out and have been out.

"Q. Then you didn't call for any particular supplies? A. Yes, sir; I called for a lantern and flags, and he says: 'We are out of flags,' and threw me a red

rag, and I says, 'Well, you had better look close, if anything happens they would hunt it up,' and he found the bottom of a lantern down stairs and the top upstairs, and he didn't give me any torches or anything else.

"Q. *And you didn't call for any torches, did you?* A. *He told me he didn't have any more supplies.*

"Q. You didn't call for any? A. *No, sir;* when he told me he didn't have any, its no use to call for them.

"Q. What did you ask him for? A. I don't remember; I started to ask him for everything I needed and he said.he was out of supplies; supplies mean everything we need on the engine.

"So you didn't really ask him for anything? A. Yes, sir; I asked him for a lantern and for a flag, he gave me a red rag.

"Q. Wasn't it a fact the lantern and flag was all you went for? A. No, sir.

"Q. That is all you called for? A. There was no use *to call for any more.*

"Q. But that's all you did call for? A. I would have called for more if he hadn't stopped me.

"Q. You can answer this question; isn't that all you called for? A. *Yes; its all I called for.*

"Q. You knew it was a rule of the company that before exposing yourself in working or being on the tracks or grounds of the company or working with or being in any manner .on or with its cars, engines, machinery or tools, you must examine for your own safety the condition of all machinery, tools, trucks, cars, engines or whatever you may undertake to work upon or with, before you make use of or expose yourself on or with the same, so as to ascertain as far as you reasonably can their condition and soundness, you understand that? A. Yes, sir; I understand everything is supposed to be in good shape before you go out."

It thus appears that the respondent called for a lantern and a flag and nothing else. He made no re-

quest for a torch, no request for.hand oilers, or for a
new steam gauge light.   But the want of a good lantern
and a flag had nothing to do with the accident; which,
if due to defective appliances. at all, and in so far as
it was due to them, is attributable primarily to the im-
perfect torch—the light that failed—and secondarily to
those other imperfect vessels (hand oilers and steam
gauge light) from which oil dripped on the floor.   But
he complained of none of those articles, nor asked for
others; and obviously he neither gave notice of the bad
torches, nor of the other articles that were in bad order,
and no servant of the railway company but himself is
shown to have had any notice, actual or constructive, of
their condition.   If there was a neglect of duty by an
employee of the company, it was by the respondent.  He
had more than five hours after he went to the engine and
before the train left Slater, in which to repair appli-
ances that were out of order or procure good ones, and
it was his duty to make a reasonable exertion to do one
thing or the other.   He did neither, and the excuse he
offers for his omission is that the supply agent told
him when he asked for a lantern and a flag, that the
supplies were out.   This answer is assumed to have dis-
pensed with the necessity of saying or doing anything
further about the engine's appliances; but the assump-
tion is too broad.   The response of the supply agent to
Kelly's request, as told by the latter in one part of his
testimony, comes near to positively excluding the infer-
ence that any more was meant than that the supply of
lanterns and flags, the articles requested, was exhausted;
for he said, in answer to the request for lanterns and
a flag:   "We haven't any; we have been out of supplies
*more or less* for two weeks."   And nowhere is the an-
swer of the agent stated in a form that justified the re-
spondent in taking for granted that there were no ar-
ticles on hand to replace those defective ones which he
did not ask for; in other words, that there were no sup-
plies of any kind in reserve.   Kelly certainly did not do

his full duty by asking only for a lantern and a flag, when he knew, if he inspected as his duty required, that there were other tools in bad order and unsafe to use on the trip. The truth intrinsic in his narrative is that he was perfunctory, indifferent and willing to risk the appliances he had. So loose a performance of a most important task would inevitably lead to disaster in a business as hazardous as the operation of a railroad and can not be accepted as adequate. The chief managers of a railway company must trust to employees to notify them of faulty and defective machinery in their respective departments, and Kelly was looked to for information as to the state of the particular appliances we are concerned with. It would be mere guesswork to say he would not have been given a new torch if he had asked for it. No doubt, if some one else had been hurt in consequence of Kelly's neglect, the railroad company would have been censurable. We hold that it is apparent from the respondent's own version of the accident and the condition of the engine appliances which, according to him, led to it, that he was to blame, in so far as human agency entered into the affair as a proximate cause.

If he did not have safe implements to work with and a safe place to work in, it was his own fault, or nobody's, so far as the testimony shows. If we accept the latter view, the case presented is a typical one for the defense of assumed risk. The doctrine of assumption of risk is of narrow range and application in our jurisprudence as it has been moulded in recent years by statutes and decisions. Public policy refuses to permit an employer to screen himself from the consequences of an injury his neglect inflicts on a servant, by saying the servant took the risk. Blanton v. Dold, 109 Mo. 64; Curtis v. McNair, 173 Mo. 270; 1 Labbatt, Master & Servant, sec. 2. But an employee does assume the risk naturally incident to his occupation, including the risk of injury from defective machinery, after the master had used or-

dinary care and reasonable diligence to furnish safe machinery and to keep it safe, and, especially the risks incident to his own neglect; which, indeed everyone takes in every-walk of life. Last citations above; Steinhauser v. Spraull, 127 Mo. 541; Fugler v. Bothe, 117 Mo. 475. As there is no evidence tending to prove any servant or agent of the railway company was guilty of a negligent act that was connected with the injury, unless the respondent was, it follows it was an incident of the respondent's employment and was assumed by him, as the risk was obvious.

The instructions given in this case in behalf of the respondent declared it was the appellant's absolute duty to furnish respondent safe appliances and a safe place to work, instead of declaring it was bound to exercise ordinary care to do so; but we have no occasion to take the instructions up and discuss them, as we hold there was no case for the jury.

The judgment is reversed. *Bland, P. J.,* and *Reyburn, J.,* concur.