ARCOLA SUGAR MILLS CO. v. LUCKEY.

(Court of Civil Appeals of Texas. El Paso. Feb. 8, 1912. Rehearing Denied March 6, 1912.)

1. MASTER AND SERVANT (§ 104*)—TOOLS AND APPLIANCES—LOCOMOTIVES—JACKSCREWS.

Where a sugar mill company operated a short railroad on its plantation, and operated thereon only one small engine, which was in service only during the grinding season of each year, the company was not required to furnish jackscrews to be carried on the engine for use in putting it back on the track, if derailed; such screws being kept in a convenient place on the plantation.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 176; Dec. Dig. § 104.*]

2. MASTER AND SERVANT (§§ 101, 102*) — TOOLS AND APPLIANCES—DUTY OF MASTER.

A master must use reasonable care to provide and maintain reasonably safe tools and appliances for the use of his servants.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 173; Dec. Dig. §§ 101, 102.*]

3. MASTER AND SERVANT (§ 229*)—CONTRIBUTORY NEGLIGENCE—DUTY OF SERVANT.

It is the duty of a servant in the discharge of his duties to use reasonable care for his own safety.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 674; Dec. Dig. § 229.*]

4. MASTER AND SERVANT (§ 206*) — ASSUMPTION OF RISK—RISKS ASSUMED.

A servant assumes all the ordinary risks of the service.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 550; Dec. Dig. § 206.*]

5. MASTER AND SERVANT (§ 235*)—CONTRIBUTORY NEGLIGENCE—TOOLS AND APPLIANCES —REQUEST FOR OR CHOICE OF APPLIANCES.

Where an engine operated on a sugar plantation was derailed, and the engineer, knowing that jackscrews were the proper and safe appliances for putting it back on the track, did not request their use, or state the necessity for

their use, in putting the engine back, although jackscrews suitable for the re-railing of the engine were kept in a convenient place on the premises, accessible to him, and could have been had by him upon request, his failure to ask for them was negligence, defeating recovery for injuries resulting from the use of other appliances.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 715; Dec. Dig. § 235.*]

Appeal from District Court, Harris County; Norman G. Kittrell, Judge.

Action by John Luckey against the Arcola Sugar Mills Company and another. Judgment for plaintiff against the Arcola Sugar Mills Company, and it appeals. Reversed and rendered.

Baker, Botts, Parker & Garwood (C. R. Wharton and J. H. Tallichet, on the brief), for appellant. James A. Breeding and Geo. H. Currier, for appellee.

McKENZIE, J. This is a suit by appellee, John Luckey, as plaintiff, against the International & Great Northern Railroad Company and Arcola Sugar Mills Company, as defendants, for personal injuries alleged to have been caused him by the negligence of the defendants. Upon the trial of the case, the trial court peremptorily instructed a verdict for the defendant International & G. N. Railroad Company. Upon the case being submitted by charge of the court to the jury as against the Arcola Sugar Mills Company, the jury found verdict for appellee in the sum of $5,000, upon which judgment was duly entered.

The plaintiff's first amended original petition, upon which the case was tried, omitting formal parts, is as follows:

"That the Arcola Sugar Mills Company is a corporation owning and operating a sugar plantation in Ft. Bend county, Texas, and as an adjunct thereto also owns and operates a line and lines of railroad into and through the said plantation and outside of the same, for the purpose of transporting and hauling the products of the said plantation, and upon which freight and passengers are also transported and carried. That on the 18th day of November, 1908, plaintiff was in the employ of the defendant the Arcola Sugar Mills Company as engineer on one of its locomotive engines, owned and operated by the said company on its said road and its tracks in and about the said defendant's plantation, and along and upon the tracks of the International & Great Northern Railroad, adjacent thereto, and that he was handling and controlling, as engineer thereof, one of the engines of the defendant the Arcola Sugar Mills Company, for which service he was then and there employed by the said defendant. That in the course of his said employment it became necessary, under instructions from his said employer, to go with his said engine upon the tracks of the defendant the International & Great Northern Railroad, and while upon the said tracks the engine of which this plaintiff was in charge became derailed through the carelessness and negligence and want of due care on the part of the agents and servants of the said railroad company in leaving an open switch, into which this plaintiff, with his engine, ran. That after the said engine was so derailed this plaintiff applied to the said defendant the Arcola Sugar Mills Company to have the same replaced upon the tracks, as was his duty to do, and the said defendant then and there detailed a force of men to replace the same, and this plaintiff was assisting them in the said work of replacing his said engine on the tracks, which was a part of his duty under his said employment. That while engaged in the work of replacing the said engine on the said tracks a rail, which was then and there employed and used for that purpose, broke and fell upon this plaintiff, seriously wounding him and bruising him on his hip, his thigh, his leg, and his foot, breaking and shattering his said leg and his foot and the bones thereof, which said injuries were and are very painful, and from which he has suffered the most excruciating physical pain and mental anguish, and will continue to suffer as long as he shall live. That this plaintiff's said injuries are of a permanent nature, and have rendered him a cripple for life, and he says he has suffered and will continue to suffer during the remainder of his life the most excruciating pain and mental anguish by reason thereof. That the said accident and consequent injuries to this plaintiff were wholly due to the carelessness and negligence of the said defendants, and each of them, and were not due to any want of care on the part of this plaintiff, in this: That said defendant the International & Great Northern Railroad Company was careless and negligent, in that it left an open switch in its said tracks where it knew and had reason to know that this plaintiff was liable, at any time, to go and be with his said engine, and failed to leave any warning or signal that the same was so open, and knowing at the same time that this plaintiff was liable to be and go upon the said tracks with his said engine at any time, and that if he did so his said engine would be derailed. That the said defendants, and each of them, carelessly and negligently failed and refused to furnish to this plaintiff, or to those whose duty it was to replace the said engine upon the tracks, or to place on the said engine, proper, reasonably safe, or sufficient appliances to be used in replacing said engine on the tracks, or to furnish any appliances reasonably safe or sufficient for that purpose, and the said negligence to so furnish appliances which were reasonably safe and sufficient for the purpose mentioned was the proximate cause

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key No. Series & Rep'r Indexes

of the accident and the injuries to plaintiff complained of.

"This plaintiff further says and charges that when his said engine ran into said open switch and was thereby derailed he reported the same to said defendants, and asked for help and such assistance as was necessary to have the same replaced on the tracks, and for means and appliances with which to do the said work. That the said defendants sent to him and to his said engine a gang of men in charge of a foreman or superintendent, and with them implements and appliances for the work then and there intended. That under his said employment it was the duty of this plaintiff to render all assistance which he could in replacing the said engine on the tracks. That the implements and appliances then and there employed by the defendant consisted of a steel or iron rail, which was then and there used as a pry to raise the said engine, and as the same was thus raised, it was the duty of this plaintiff to block the same up with blocks, so that a frog or other appliance could be placed under the wheels of said engine, and then placed or rolled onto the tracks. That while the said engine was being so raised up, and while this plaintiff was placing the blocks under the wheels of the same, the said rail, which was then and there being used as a pry, broke, and the entire weight of the same fell upon this plaintiff's leg, his foot, his thigh, and his hip, breaking his said leg and crushing his foot, wounding and bruising his hip and his thigh as hereinabove complained of. This plaintiff further says and charges that the way the said engine was attempted to be replaced on the tracks was not the right or the safe way, and that the appliances that were so furnished by the defendants for that purpose were not the proper, reasonably safe, or sufficient appliances for that purpose, all of which was well known to the defendants and each of them; but this plaintiff says and charges that they were the only appliances furnished or used by the said defendants for the purpose for which they were then and there being used, and he (plaintiff) supposed that the same were sufficient, and relied on them and the said defendants, and believing that the said defendants would furnish to him only such appliances as were reasonably safe and sufficient for the purposes for which they were then and there used and to be used. This plaintiff here now says and charges that jackscrews were proper and reasonably safe appliances to be used in such cases for the re-railing of the said engine, and if the defendants had furnished him with the said appliances he could and would have re-railed his said engine without accident or injury to himself or to any one else. That at the time this plaintiff applied to the said defendants for assistance to re-rail his said engine he did not know, and had no reason to know, and could not have known by ordinary care in the discharge of his own duties, that the said defendants had at hand, on the said plantation, such things or appliances as jackscrews, but he says and charges that since the said accident and injuries to him he has learned that the said defendants did have, in a convenient place and near where the said derailment took place, a number of jackscrews suited for the purpose of re-railing the said engine; and this plaintiff further says and charges that, if it was not the duty of the defendants, under the circumstances, to keep and have the said jackscrews on the engine of which plaintiff was then and there in charge, it was their duty to have furnished the said jackscrews to him at the time he applied to the defendants for assistance, instead of sending to his assistance the help which they did, and instead of furnishing the appliances which they did, and which were wholly insufficient for the purpose intended, and improper and dangerous appliances; and that the failure of the said defendants to so furnish jackscrews or other suitable appliances, and furnishing the assistance and the appliances which they did furnish, was negligence on their part, and that such negligence was the proximate cause and the efficient cause of the accident and the injuries to the plaintiff complained of. That when the said engine became derailed the drive wheels on both sides left the tracks and dropped between the ties, and there became so locked and fastened as that the said engine could not be moved with her own steam, and therefore, notwithstanding the fact that the said defendants did have placed on the said engine frogs or inclines, which are sometimes used for the purpose, they were entirely useless in re-railing the said engine at this time, owing to the fact that the same could not be moved with her own steam. That at the time of said injuries to him this plaintiff was in the discharge of the duties of his employment, and was in the proper use of the implements and appliances furnished to him by the defendants with which to do his work, but he says and charges that the said implements and appliances were defective and wholly unsafe and insufficient for the purpose then and there employed, and he further says and charges that the same were the only tools, implements, and appliances furnished for the purpose, and at the time of the injuries, above stated, this plaintiff was using due and proper care for his own safety, and relying on the sufficiency and safety of the said appliances so furnished by the said defendants, as aforesaid; and he says that the said injury to him was not the result of any want of ordinary care or prudence on his part, but wholly due to the want of care and the negligence of the said defendants, as is above set forth."

The defendant Arcola Sugar Mills Company pleaded general denial, and specially

pleaded, in substance: (1) Negligence on the part of plaintiff in failure to exercise ordinary care to select and use reasonably safe appliances, and in negligently selecting and using unsafe and unsuitable appliances; (2) negligence on his part in putting himself in a place of danger during the re-railing of said engine, and in negligently and carelessly failing to keep himself in a place which would be reasonably safe; (3) assumed risk; and (4) fellow servant.

From plaintiff's testimony, we find that the accident occurred November 18, 1908, while he was employed by the defendant Arcola Sugar Mills Company as locomotive engineer; that he had worked for them for four or five years, during the grinding season. Previous to the accident, he had been a locomotive engineer on large railroad systems for about 25 years. We quote at length plaintiff's testimony, in his own language, as follows:

"The cause of my getting my leg broken was a steel rail breaking. The steel rail broke in prying up the drivers of the engine. * * * I went out in the field and got some cars of cane to be unloaded. I pushed them up to the sugar mill to be unloaded, and I was standing on what they call 'track No. 4,' to have the cane unloaded, * * * and when the cars were unloaded * * * I got up on the engine and started the engine ahead, looking back to see if all the cars was coupled together. I got a signal from the brakeman to go ahead, and when I turned around forward I saw an open switch, and I reversed the engine and tried to hold it, and the engine wouldn't hold herself. * * * I tried to get it on by her own steam; the engine got off of the track through that open switch, and I tried to get her on with her own steam, but I couldn't make it. The reason I couldn't get her on with her own steam was because she was bound in between the ties on the right-hand side. I mean the wheels were bound between the ties, the drivers; so I got down. * * * We shoved the cars back from behind the track to see if we couldn't get her on by her own steam, and she wouldn't go on; so I see I couldn't get her on, and I went up to the sugar house and told them I couldn't get the engine on, and I would like to get help to put her on; so they sent a squad of convicts to help me. When I looked ahead and saw the open switch, I guess I was about two or three cars length from it. * * * When I saw the open switch ahead of me, I reversed the engine and tried to hold her with her own steam, but she wouldn't hold. Mr. Warden was stationary engineer of the sugar house. Mr. Geerken had charge of the operation of the mill and of me; he was the chief engineer. Mr. Warden was assistant engineer. I went back to the sugar house and told Mr. Warden that I couldn't get the engine on the track; that I wanted help to get her on. I told him I had the engine off the track and couldn't get her on with her own steam, and I wanted help to put her on. He said he would have to see Mr. Geerken. I don't know whether he saw Mr. Geerken or not. I went down to the engine after I told him about it. He sent a squad of convicts down there. I did not see anything in the way of appliances to put the engine on with. I saw the men coming. I had two inclines on the engine. I mean by inclines, we place them between the drivers, and in case she moves herself these inclines will roll her back on top of the rails again. Some people call them 'frogs.' They have different names. When the engine will not move by her own steam, you can't do anything with the inclines at all. That is all I ever had on the engine. They never furnished me or showed me any appliances elsewhere to be used in case of derailment. When the squad of convicts came there, the first I saw they fetched a rail. * * * It was a 30-foot rail. * * * Mr. Scott had charge of the convicts at the sugar house; Mr. Scott was boss over them when they were working there at that time. Mr. Scott came there with them. I couldn't tell you who was directing their movements. I can't tell you who told them what to do. I did not at any time tell them what to do. * * * They had blocking like that, * * * and they were going to put the rail down * * * and pry up the drivers with this steel rail. While they were doing that, I was standing there, waiting to put some blocks up under the driver between the ties, in case they did. As they would raise it up, I would put under the blocks. They didn't raise it any at all, not that I could see; the rail broke. While they were attempting to pry up the drivers, the rail broke and caught my leg above the ankle and broke it. The rail fell on my leg. If I had had proper appliances, such as jacks and so forth, I could have put that engine back on the track, me and my fireman and brakeman; if I had had these appliances, I would not have had to have gone to the mill. There is no danger to be encountered by the use of jacks in that way. When the rail broke, I was standing there. In case they raised the driver, I would put blocking under the driver. I was standing alongside of the driver. * * * I never did see any jacks about the place there. * * * On that engine that I was employed to run down at the Arcola Sugar Mills, they never had on it, or convenient to it, as far as I know, any jackscrews. In case of derailment, the proper implements to be used to re-rail an engine which has been derailed in that way, they have these inclines and jacks and levers and pinch bars. I stated a while ago that the way this engine was derailed inclines were useless. The next thing to resort to, if they had jackscrews,

we could put them under and jack her up, and then use these inclines; that was the proper way to do it. Jackscrews were the proper appliances to be used there for that purpose at that time; when you can't get an engine on by her own steam, you use jackscrews. If I had been furnished with jackscrews, I would have used them to put that engine back on the track."

On being cross-examined he testified: "I am a locomotive engineer; that is, I have worked in the past for regular steam railroads. The first road I worked for was Northwestern. I started to work up in Nebraska; I started as a fireman. * * * I fired 3 or 4 years. After those 3 or 4 years firing, I was put up as an engineer. I guess I ran as engineer up in that country 4 or 5 years. * * * From Nebraska I came down to Texas. I went to work for the T. & P. I guess I worked for them as engineer a couple months; then I went to the I. & G. N. * * * I worked for the I. & G. N. * * * 19 years and 2 months. * * * I had been working for the Arcola Sugar Mills Company about 3 or 4 seasons; I couldn't tell exactly. The employment only lasted a few months in the fall of the year, when they were harvesting the crop and grinding. * * * That railroad of the Arcola Sugar Mills Company was a small road with one engine, and I ran that engine; it was a little 4-wheel 15-ton engine; it was called a 'dinkey' or 'dummy' engine, and it hauled these small cane cars used in the plantation. Myself and Johnson were the locomotive engineers there. I worked in the daytime, and Johnson worked nights. We worked that way all the time. During the grinding season, they work night and day out there; there is no other locomotive engine. Mr. Geerken was stationary engineer; he has got full charge there. Mr. Warden is stationary engineer under him. Geerken and Warden ran the machinery in the sugar house; I ran the locomotive engine. * * * I was boss on the engine; I was the engineer. I had a crew of two negroes. * * * Pink Hall was the fireman, and George Peoples was the brakeman; that was my crew. * * * The engineer is in charge to get her on if he can, and remain in charge until he is relieved, whether that is soon or late; the engineer is in charge until he is relieved by a superior officer. When I find out that I cannot get the engine on, it is my business to report it. I am in charge to get that engine on if I can get her on with her own steam. As soon as this engine got off, I tried to get her on with her own steam. * * * I gave her steam. * * * The wheels would not turn; they wouldn't move at all. Then I went up to the sugar house and told them I was off the track and couldn't get her on; I said I wanted help to put her on. I then went down to the engine. I couldn't tell you how long it was before anybody came there. * * * While I was waiting for them to come, I got some blocking to put under the drivers, in case they raised her. I got the blocking close by there. * * * In case they raised her up, I would put the blocking under the driver. * * * I said I got some blocking; it was there. The convicts had not gotten there then. * * * I had the blocking there, so that I could put it under the driver, in case they raised it. I didn't know how they were going to raise it; I thought they were going to send jacks or something to put her back on. I didn't say nothing. I don't know where they were going to get those jacks. I thought they were going to send something; I didn't know what they were going to send. * * * I believe that engine had been off once or twice before when I was running it; we got it on with these inclines. I didn't send for any help; I didn't need it. I found I could get her on myself. She rolled right on herself. I believe since I have been running there, I think only once or twice I had her off. I never had used a rail to prize up the engine with, or any part of it. * * * It is my place to see that the lubricating oil is there. We have oil cans on an engine. If they are not there, I do not just suppose they are there and go on without them; the oil cans are always there. If they are not there, I go and see the man in charge, the foreman, and tell him I got no cans, and he is paid to get them. In other words, if you don't see what you want, you ask for it. In running an engine, it is common sense to do that. I know what was on this engine of mine, and I knew what was not there. I did not know that if I didn't find what was needed there that I could get it by asking for it. When I first went down there, I told them there was no inclines or anything there. When we didn't have them there, I never got off of the track between the time before they got them. I don't know who got the inclines; I told them that they were not on the engine. When I told them that, they didn't do nothing. I don't know how long afterwards it was before they got the inclines; it was a long time afterwards they did get the inclines. * * * I never was off of the track only once or twice all the time I was there, four or five years. * * * As to whether I asked for jacks, I told them there was nothing on the engine. * * * They got the turtle backs or inclines. * * * I told them that there was nothing on the engine when I first went down there; that was in 1903 somewhere; I don't know exactly. I didn't say no more about it, because I had no use for anything. I never got off the track any more. I have worked as an engineer a great many years. * * * I know about handling an engine and how to get one on when it gets off the track;

naturally in 25 years' experience anybody would learn that. I went down to this plantation and went to work about 4 years before the time I got hurt. * * * This was maybe my fourth season. When I first went down there, I was the only locomotive engineer there; but later on they did have a shift. * * * When I went down there, I didn't see any jackscrews on the engine; I didn't see any need for any at that time; I never got off. As to whether at any time I asked for jackscrews, I told them when I first went down there that they didn't have nothing on the engine. There never was any jackscrews put on the engine. During all those four seasons' work there, I have never had any occasion to use any jackscrews. I had never seen any there in the toolhouse. As to whether there might have been some there, I don't know anything about that business. The mill and other buildings on the plantation were all grouped together. * * * In all these four years that I worked there, I say that I never saw any jackscrews on the place. I don't know whether they had any or not; I don't know nothing about it. * * * When this engine was off, and I found I couldn't get it on with turtle backs, I went up to Henry Warden and asked him where Mr. Geerken was; he told me that Mr. Geerken was asleep. It is not a fact that I went up there and asked Mr. Warden, 'Where are those jackscrews around here?' I told him I wanted help to put the engine on the track; I didn't ask him for any jackscrews. I didn't know if there was any there or not. I said to Warden: 'I want help to get the engine back on the track.' Mr. Warden·had never gotten that engine back on the track. I don't know nothing about that. After I left, my leg hurt me too bad. Before that, Henry Warden was not the man that would come out and get the engine back on. Q. You say you told him you wanted help to get her back? A. Yes, sir; that was my exact language."

On redirect examination: "If they had furnished me jackscrews, I think I could, with the help I had, have put that engine back on the track without stopping the mill. I could have done it without danger of injury to myself or any one else. Under my employment there, my duty was to haul in sugar cane from the field up to the mill. I did not have anything to do with loading the cane. I did not have anything to do with unloading the cane. All I did was to operate the engine and set the cars up there."

A witness for appellee with 25 years experience in the railroad business testified that, "if I had an engine derailed, so that I couldn't get it back on with its steam, * * * the first thing I would look to get it back on would be jackscrews."

Without quoting at length the testimony of other witnesses, both for the plaintiff

and the defendant, we hold that it was proved conclusively at the trial that the defendant was amply supplied with jackscrews suited for the purpose of re-railing the engine; that said jackscrews were kept in a convenient place near where the derailment took place and accessible to plaintiff, and that the use of the jackscrews could have been had by the plaintiff upon his making request therefor; and that plaintiff made no inquiry for jackscrews, nor did he make demand or request of any one to furnish him with jackscrews with which to re-rail the engine. It further appears from the evidence that the derailment of the engine took place within two or three hundred feet of the sugar mill and toolhouse, where the jackscrews were kept.

Defendant's first assignment of error, which embraces the sixth, twenty-seventh, and twenty-eighth assignments of the record, is as follows: "The court erred in refusing to grant the special charge No. 1, requested by defendant, which reads as follows: 'The jury is instructed that there is no issue of fact in this case, and you will therefore return a verdict for the defendant.' The verdict and judgment should be set aside, because the uncontroverted evidence shows that the jackscrews, the appliances testified to have been the proper appliances for use in re-railing the engine in question, were accessible to plaintiff, Luckey; that he knew of their presence, or, if he did not actually know that they were there and accessible, he could have known it by the exercise of ordinary care in the discharge of his duty; and therefore no negligence could be predicated upon the defendant's alleged failure to furnish these instrumentalities. The verdict of the jury should be set aside, because it is without any evidence to support the allegations that defendant failed to furnish jackscrews, which were alleged to have been the proper appliances for use in re-railing an engine."

Under this assignment the following propositions are submitted: (1) "There is no issue in the case authorizing its submission to the jury, or justifying the verdict rendered by the jury." (2) "The defendant is not liable for failure to furnish appliances or for lack of appliances arising from a temporary condition in the progress of the work being done." (3) "Plaintiff, being an experienced railroad man, and knowing that jackscrews were the proper instrumentalities for use in re-railing an engine, and knowing they were not on this engine, should have requested these appliances of some one in authority, and, failing to do so, since it conclusively appears that he could have had them if he had made a request for them, he cannot now be heard to make any complaint at company's failure to have them present at the time he was undertaking to re-rail the engine."

[1] We have quoted at great length appellee's testimony in his own language, which, taken with the trial petition, shows most conclusively that he attributes the accident to the appellant's failure to furnish him with jackscrews to re-rail the engine. Appellee testified: "If I had had proper appliances, such as jacks and so forth, I could have put that engine back on the track, me and my fireman and brakeman; if I had had those appliances, I would not have had to have gone to the mill. There is no danger to be encountered by the use of jacks in that way." It is also shown by the evidence that the plaintiff made no inquiry or request for jackscrews, and, had he done so, jackscrews could have been had for the re-railing of the engine; that the jackscrews were kept by the defendant in a convenient and accessible place, where they could have been had for re-railing the engine. Therefore the essential inquiry is, Was or was not the defendant company guilty of negligence in the matter of furnishing proper appliances (jackscrews) to put the engine back on the track after it was derailed? It will be observed at the outset that the plaintiff had operated the engine during the several seasons while he was in the employ of the defendant, and that during that entire period of time he had never had an occasion to use jackscrews. Quoting plaintiff: "When I first went down there I didn't see any jackscrews on the engine; I didn't see any need for any at that time; I never got off. * * * During all those four seasons' work there, I have never had any occasion to use any jackscrews. * * * I never was off the track only once or twice all the time I was there, four or five years." Plaintiff also testified that at each time his engine was derailed he had re-railed it with inclines which he had on his engine. The derailed engine was a locomotive of small type, and the only one used on the plantation. It was used to haul small plantation cars. The cars were used to haul cane from the field to the mill for grinding. The tracks over which the engine and cars were used extended into the field or plantation. The engine was in service only during the grinding season of each year. The plaintiff was on duty in operating the engine during the daytime, hauling the cane from the field to the sugar mill. From the evidence, we hold that the defendant was not required to furnish jackscrews to be carried upon the engine.

[2-5] It is a well-established rule of law that the master must use reasonable care to provide and maintain reasonably safe tools and appliances for the use of the servant; but it is also a well-established rule of law that a servant, in the discharge of his duties, will use reasonable care for his own safety; that he assumes all the ordinary risks of the service; that he is competent and capable to perform the service. In the instant case, it is undisputed that Luckey was a skilled engineer, having spent the greater part of his active life as a locomotive engineer; that he was in charge of this engine, and that he had operated it for four seasons; that when the engine was derailed, and it could not be re-railed by the use of inclines alone, he regarded jackscrews as the only correct appliances for use in re-railing the engine; and that by the use of jackscrews he could, with the assistance of his fireman and brakeman, have put the engine back on the track without danger to any one. Instead of making demand or request for jackscrews, as was his duty to do, for the re-railing of the engine, he went to the sugar house and asked for help. He never asked for or requested jackscrews; nor did he make known to any one the necessity of jackscrews in re-railing the engine. We think, too, it is apparent from Luckey's testimony that his request for help did not mean that he was requesting jackscrews; he evidently meant that he wanted additional men to assist him in the re-railing of the engine. Luckey knew that jackscrews were the proper appliance to be used in re-railing the engine, and knew the dangers to be encountered by the use of the railroad rail; and, it being established by the uncontroverted evidence that jackscrews suitable for the re-railing of the engine were kept in convenient places on the premises, accessible to him, and could have been had by him upon mere request, we hold that it was his duty to have made request or demand for the jackscrews. We also hold that the defendant was not guilty of any negligence, in that it had complied with the requirement of the law, in that it did provide itself with the jackscrews suitable and convenient for use by plaintiff, and it was not its fault that plaintiff failed to provide himself with them. 26 Cyc. 1248; Kelley v. Chicago & A. Ry. Co., 105 Mo. App. 365, 79 S. W. 973; Countryman v. East Tennessee, V. & G. Ry. Co., 89 Ga. 835, 16 S. E. 84; Myers v. W. C. De Pauw Co., 138 Ind. 590, 38 N. E. 37; Smart v. Louisiana Electric Light Co., 47 La. Ann. 869, 17 South. 346; Carroll v. Western Union Tel. Co., 160 Mass. 152, 35 N. E. 456. We do not think that the master ought to be held responsible for accidents that inflict harm when they are caused by the servant's inattention to his duties, or his careless performance of them. If the master should be held responsible in such cases as this, there would be no limit to the employer's liability, and the employé would be absolved from the duty of exercising care to prevent injury to himself. In this case, the evidence is not conflicting. It is undisputed that the proper appliances were furnished. The master had performed its duty in providing the appliances; there is no negligence proved against it; the negligence which resulted in the accident was on the part of Luckey himself in failing to make request for the jackscrews. We hold, as a matter of law, the trial judge should have

granted the requested charge, and have directed the jury to return a verdict for the defendant. Because of our holding in this case, we deem it unnecessary to consider the appellant's other assignments of error.

It is ordered that the judgment of the district court be reversed, and that judgment be here entered for the appellant.