FORT WORTH STOCK YARDS COMPANY v. E. M. WHITTENBURG.

Decided January 2, 1904.

**1.—Assumed Risk—Sand Bank Falling—Open Danger.**
Plaintiff, an employe, was directed to haul a load of sand from a sand bank. The particular place was not pointed out to him, nor did the employer know the bank was dangerous at that place. Plaintiff was inexperienced and was not warned, but the liability of the bank to fall was a matter open to common observation. Held, that the danger of injury from the falling of the bank was an assumed risk.

**2.—Same—Knowledge of Natural Laws.**
It must be assumed that plaintiff was acquainted with the laws of gravitation and knew that a body of earth unsupported below was liable to fall at any time.

Appeal from the District Court of Tarrant. Tried below before Hon. M. E. Smith.

*N. H. Lassiter, C. M. Templeton,* and *Robert Harrison,* for appellant.

*Wynne, McCart, Bowlin & McCart,* for appellee.

CONNER, CHIEF JUSTICE.—Appellee recovered a judgment against the appellant company for the sum of $1000 as damages for personal injuries caused by the fall of an overhanging bank of earth at a sandpit to which appellee had gone for the purpose of getting a load of sand. Among other things appellant pleaded assumed risk on appellee's part, in that the danger was "as open and apparent to the appellee as to the appellant, and that the appellee, in undertaking to work in and about the sand bank, assumed the risk of its caving or falling in on him."

Error is first assigned to the action of the court in overruling appellant's motion for continuance in order to procure the testimony of H. P. Hayes, W. J. Campbell and H. R. Upp, residents of Tarrant County. It appears that the case was first set for trial on the 10th of March, 1903. On the 7th day of that month appellant procured subpoenas for said witnesses, which were served on the 9th of March. The case was not reached for trial until on or about the 13th of March, upon which day the witnesses named were not in attendance. The case was accordingly postponed on account of the absence of these witnesses, and reset for the 1st day of April. Appellant, on March 31st, caused other subpoenas to be served upon said witnesses, but they were not present on April 1st, and appellant announced not ready for trial because of their absence, and the case was again postponed until 2 p. m. of that day for the purpose of procuring the attendance of the witnesses. After such postponement appellant's attorneys telephoned to the general manager of the appellant company and requested him to endeavor to see said witnesses and have them appear at 2 o'clock p. m. of that day, which he promised to do, if possible. At 2 o'clock p. m., however, the witnesses were not present, and formal application was accordingly

made for a continuance, it being presented as an application for a first continuance, and as such was formally sufficient. We think a mere statement of the facts a sufficient demonstration of a want of diligence on appellant's part to secure the attendance of the witnesses on account of whose absence the application was made, and are of opinion that the court properly overruled the application. See Rev. Stats., art. 2267; Railway Co. v. Hall, 83 Texas, 675; Doll v. Mundine, 7 Texas Civ. App., 104.

Appellant's further contentions are to the effect that the evidence fails to show any negligence on its part authorizing a verdict in appellee's favor, and that it affirmatively appears that the accident to appellee resulted from a risk assumed by him. But three witnesses testified, all of whom were offered by appellee. The testimony is without conflict, and is substantially as follows: .

Appellee testified that he was 60 years of age, and had been a farmer most of his life; that in July, 1902, he was working for the appellant company under one of its foremen, a Mr. Godwin; that most of the time he hauled lumber and posts and different things, using a two-horse wagon and team of his own; that while so employed Godwin directed appellee "to go down to the ravine and get a load of fine sand to set brick with." Further quoting appellee's testimony, he testified that, "I went down the branch as I was directed to, somewhere near the place, as I thought, something near the bank, jumped out of my wagon to look for sand. When I got out of my wagon I got crippled. When I got out of my wagon I didn't do anything; didn't get a chance to do anything. The bank caved off on me. It was a bank of earth and dirt; I suppose it was some seven or eight feet high. I never measured it. I drove my wagon up within five or six feet of the bank. * * * I never had hauled any sand out of this pit before this. * * * I did not notice anything unusual about this pit when I went down into it to get the sand. I viewed along the bank and in the branch to hunt for sand, the kind of sand that the gentleman wanted, and there was nothing in the bank that I wanted that I could see. * * * I did not know anything about this bank being in a dangerous condition or likely to fall; didn't know anything about that. I did not observe anything unusual about the appearance of it to indicate danger. * * * There wasn't any pit, nothing but a piece of level ground near the bank, and I stepped off the wagon on the ground to examine for sand; I was near the bank and the bank caved in and I done nothing, but just did get out in time to get hurt. I got out on the side next to the bank. I don't know how much of the bank caved in on me." Cross-examined he further testified: "I suppose this gravel pit was 300 or 400 yards from the place where I was to haul the sand. Mr. Godwin just came to me and says that 'I want you to put on your dump boards and go down there, right down that branch there, wherever you can—near that bank along there—wherever you can find some sand suitable to set brick with, and bring me a load right at once.' He did not tell me to go to

any particular place; just told me to go down that way and get some sand, wherever I thought I could get it; directed in the branch. I went down this branch according to his directions. At the time there were men just a short distance below me at work; I don't know what they were doing; I expect getting our gravel; I guess they was; I didn't pay much attention to them; none of my business to look after them. They were, I suppose, seventy-five or eighty yards from me. There was nobody at work right at the place where I got hurt. I couldn't tell whether there had been anybody at work there for several days or not; if anybody had been at work there that morning I don't know of it. There was so many wagon tracks in there, as it was a large gravel bed, that I couldn't tell whether anyone had been working there that morning before I was hurt or not. I had hauled some gravel before this time while I was working for Armour & Co., but not from this place, but never hauled any sand. * * * I don't know who this gravel bed belonged to. If I remember right, I had hauled the gravel for Armour & Co. about two weeks prior to the time I was hurt. * * * No one cautioned me about this bank or said anything to me about it at all. I had not heard anything about the bank being dangerous before I went to the bank. * * * I could see this bank. Had every opportunity to look at it and did not see anything. I could glance along the bank and see, and couldn't see anything. * * * Everything was open, and nothing concealed about it."

W. J. Lattimore testified: "I had been about this bank that caved in on him (appellee). I got about 2000 yards of gravel out of the same place. I think the Fort Worth Stock Yards Company had control of the land where this gravel bed was situated. I know the exact point where the bank caved in on Wittenburg. Can not say that I exactly knew its condition prior to the time it caved in on him. I had abandoned this bed about a week or ten days before, in getting gravel out of it; it run out into a sand bank. The bank was just like any other sand or gravel bed; it was dangerous in one sense of the word, all pits become so; and that pit was more or less dangerous. I saw this pit every day, passed right by it; I can't say that there was anything unusual about this bank to indicate that it was dangerous the last time I saw it before this accident; just a straight up and down embankment. I hauled some sand from this same pit, and was given permission to do so by the Fort Worth Stock Yards Company. I don't know of their refusing to give anybody permission to haul sand there." Cross-examined: "All sand banks are more or less dangerous, and I suppose one man can see the danger as well as another. The dirt is liable to cave. As to whether one man can see that and know that as well as another, I don't know about that; it is according to whether a man is used to working in the business or not; one man could see it. Whether or not any man, whether he worked about a sand bank or not, would know it was liable to cave, I can't say as to that. My best judgment, that a man who had experience in hauling out of a place like that would have

kept back away from the bank. This was an open bank and anybody could look at it. A man that is experienced, in going in a place like that, a very high bank, he keeps his wagon far off so that if the bank gives on him he has got some chance to get out of the way. A man has to take his chances when he hauls sand out of a pit like that one; any man who does work of that kind has to take his chances more or less. There are lots of people who don't understand about gravel and sand pits, such things as that, and they are liable to run into danger."

B. K. Corson testified for appellee as follows: "I live in North Fort Worth and have lived there about nine years, I reckon. I know Mr. Wittenburg, the plaintiff in this case; got acquainted with him last year, maybe the latter part of June or first of July. I know when he worked for the Fort Worth Stock Yards Company on the North Side hauling. At that time I was engaged in delivering gravel over there on the North Side. I was working for Mr. Lattimore. He had a contract over there, and I had a contract under him hauling gravel, delivering gravel. I remember the occasion of Mr. Wittenburg being hurt by a bank caving in on him. I was north of him I reckon maybe 300 yards or 400 yards at the time. I saw him a few minutes after he was hurt. * * * It had not been more than ten or fifteen minutes before he was hurt that I had left that bank. I was right at that bank, or right close by it; had a team and some men up there getting sand out from under there, and I was standing watching it while they were at work at it; hauling sand from the same point. Take a man that didn't know anything about gravel, hadn't hauled any gravel or sand, and he wouldn't realize the danger that would be in it, that a man that had experience would; and then a man that had no experience in hauling gravel or sand, he would know they was hauling over there, and might say it looked dangerous, but these other people are hauling, they don't get hurt; I have got the same chance they have got, and there is some one watching me—to protect the others, you know. When I saw this bank the last time before Mr. Wittenburg was hurt it was in a dangerous condition. I have worked in such places five or six years, maybe ten years. This bank was controlled by the Fort Worth Stock Yards Company." Cross-examined: "I think this bank was about twelve feet high before it fell on Wittenburg, at the point where it caved in on him. Beginning at the top there was about six feet of dirt and there was two or three feet of sand and then there was gravel under that. I had had it about fourteen-feet face there and the gravel was what I was after, and I think they had got the gravel pretty nearly filled up to the sand. Any man could see that a perpendicular wall twelve feet high was more or less dangerous, but one man might know it better than another. I have men working for me that some of them will realize the danger while others won't. I consider them careless. They don't seem to realize or know the danger, some men. They could see it, but then other men being in there and working, you can't get them to realize what the dangers are, and I

always invariably went and attended to it myself." Witness was asked: "Had or not this bank caved in any other place?" and answered: "We were continually throwing it; that is, we dig under it and drag it off out of the way. I had seen Wittenburg around there probably for a month or maybe longer at the time he was hurt. He was hauling there, working for the yards, hauling lumber mostly, I think. I don't know that I had ever saw him haul in the sand pit before this, or gravel. When a bank of dirt gets top heavy it will fall of its own accord, and sometimes don't take but very little to fall. I got a load of sand at this bed, I don't think it was exceeding fifteen minutes before this accident, and maybe not more than ten; I just had quit; and then this bank was in a dangerous condition. I put my men under there and stayed and watched the bank. I had got about all I could get out until I throwed the bank. No one had worked at that immediate point from that time I was there until Mr. Wittenburg was hurt. There was some hands, I won't be positive whether they were at work that morning or not, but just a little north of the sand pit, screening; but I won't be positive about them being at work that morning; I kind of think they were, but then I am not positive." Redirect examination: "When we throw a bank I go under as far as I think it will bear and then get on top, and take crow bars and drive them down, bars of iron, and just drop it off. That is a precaution that is taken to keep it from falling in or caving on the men that work in there. That is necessary and proper to do that for the safety of the men working under the bank. In reference to the men, some of them not seeming to realize the danger of such bank, I do not mean to say that I think it carelessness; you couldn't call it that, they just don't seem to realize the danger; it is inexperience."

We deem extended discussion unnecessary. We have, however, been unable to avoid the conviction that the testimony is insufficient to support appellee's recovery. Aside from the meagerness of proof to show that the sand bank in question was at the time operated by appellant, or that appellant knew, or by the exercise of reasonable diligence could have known, of its dangerous condition after it had been made so by undermining as testified to by the witness Corson, we think it affirmatively appears that appellee's injury was a risk assumed by him within the meaning of the well established rule on the subject. The authorities undoubtedly establish the proposition that where a physical situation is open to the observation of the servant and apparent to him, and the probability of injury is as obvious to him as to the master, he must be held to assume the risk if he engages in the work. And where the situation presents nothing more complicated than a sand bank it must be assumed that a person of mature years and understanding understood the risk, and might have known thereof by the exercise of reasonable care and prudence on his part. It must be assumed that appellee was acquainted with the laws of gravitation and knew that a body of earth such as described in the testimony, unsupported, was liable to fall at

any time. No peculiarity of soil, special character of weather or unusual circumstance was shown rendering it necessary for appellee to have special experience or information of the existing condition. It was apparent. It was to be known and understood by the exercise of that ordinary care and circumspection which the law holds all men bound to exercise in their own protection. See Railway Co. v. Spellman, 34 S. W. Rep., 298; Railway Co. v. French, 86 Texas, 642, 23 S. W. Rep., 643; Railway Co. v. Lemp, 59 Texas, 22; Railway Co. v. Walker, 1 Gammel's Law Journal, 1, 8 Texas Ct. Rep., 219; Parrish v. Railway Co., 1 Gammel's Law Journal, 41, 76 S. W. Rep., 235; Larich v. Moies, 28 Atl. Rep., 661; Horton v. Fort Worth Packing and Provision Co., 33 Texas Civ. App., —, 8 Texas Ct. Rep., 255.

We conclude that the undisputed facts show that appellee assumed the risks resulting in his injuries, and that the judgment should be reversed and here rendered for appellant, and it is so ordered.

*Reversed and rendered.*

Writ of error refused.