## CITY OF MUNDAY v. SHAW et al.
### No. 1599.

Court of Civil Appeals of Texas. Eastland.
Dec. 4, 1936.

Rehearing Denied Jan. 15, 1937.

Touchstone, Wight, Gormley & Price, of Dallas, T. R. Boone, of Wichita Falls, J. S. Kendall, of Munday, E. T. Duff, of Wichita Falls, and M. F. Billingsley, of Munday, for appellant.

766

Bullington, Humphrey & King, of Wichita Falls, and D. J. Brookreson, of Benjamin, for appellees.

GRISSOM, Justice.

Mrs. Ruby Shaw, individually, and as next friend of her minor children, filed this suit against the City of Munday, a municipal corporation, for damages caused by the death of her husband, William Shaw, while an employee of the city.

Plaintiffs alleged that Shaw at the time of his death on the 23d day of April, 1935, and prior thereto, was employed by the defendant to assist in operating the city's sewer and water systems; that he also assisted in the maintenance of the streets, alleys, and sewer disposal plant, and the ground surrounding the same; that on the date of his death he was directed by R. B. Harrell "an officer, agent and employee of the city" to assist J. A. Manire, another employee in getting a truck out of a muddy place near the city's sewer disposal plant; that Harrell had obtained a Farmall tractor to be used for the purpose, and Harrell ordered Shaw to go to the place where the truck was stuck and pull it out with the tractor; that Shaw was acting under the supervision and orders of Harrell; that Shaw was not familiar with the operation and construction of a Farmall tractor; that Shaw fastened the tractor to the truck with a cable furnished him by the city; that in an attempt to pull the truck out of the mud the tractor driven by Shaw fell backward on him, crushing and killing him. Plaintiffs further alleged that Harrell did not warn Shaw "as to the construction or operation, or of the dangers incident thereto, in regard to the Farmall tractor; that it was the duty of the city * * * to furnish Shaw with safe tools and appliances to work with and safe premises to work upon." That at the time the said tractor was attached to the truck it was not equipped with what is called a drawbar, or a regularly prepared place for fastening a cable tow and that by reason thereof, and not being proper for the purposes for which said tractor was to be used, it was a dangerous implement, and which fact, it was alleged, was known to the said Harrell, or should have been known to him by the use of ordinary diligence; that the city was guilty of negligence in furnishing Shaw and directing him, through its city secretary, to use a dangerous and unsafe piece of machinery in attempting to pull said truck out of the mire. Plaintiffs alleged that the city allowed open holes to remain on its premises which became filled with water and mud in such manner that its trucks were unable to cross safely and "for the failure to so keep its premises free and clear of hazards" defendant was guilty of negligence and all of said acts were alleged to be the direct and proximate cause of the death of Shaw.

Upon the trial to the court without a jury, judgment was rendered for plaintiffs for $4,000. No findings of fact or conclusions of law were filed.

The evidence discloses that Harrell was city secretary, that his duties were, as testified by him, "of seeing what is to be done and making out new plans of work to be done and general bookkeeping work on the city's business and all pertaining to it." Ordinarily, Harrell directed the work of Shaw and Manire. "Manire's duties were more or less sanitary and Mr. Shaw was overseer of all the water works." Mr. Shaw's work was also operation of the pumps, setting meters and various other jobs. He supervised all work in connection with the waterworks. He also set and read the meters and kept two Diesel engines and two electric motors in working order. He had certain work to do with reference to the sewer system. "He tended to the motors and when any sewer pipes had to be laid he directed that." He had used the city trucks in picking up dead animals in the town and carrying them away and burying them.

The city owned and operated its water and sewer systems. It did not undertake to operate them for profit. It charged a rental for the upkeep of the systems. In 1934 and 1935 the city endeavored to fix such a rate that the income from the water and sewer systems would equal, or slightly exceed, the actual operating expenses. That is, the rate was attempted to be fixed so that when no unusual repairs or work was required that the income from the water and sewer departments would approximately equal the operating expense. During the years mentioned the receipts in each of said departments exceeded the operating expenses approximately $150. This did not take into consideration any payment on the outstanding bonds, nor the interest thereon, which expense was paid out of taxes collected. The interest alone greatly exceeded such excess.

On the occasion when Shaw was killed, the city marshal of Munday had killed a dog in the business district and had notified Manire who took the city's truck, got the dog and was taking it to near the city's sewerage disposal plant to bury it when the truck became stuck in the mud. This was not the usual place for burial of dead animals, but the employees usually buried them somewhere on land belonging to the city. The city had formerly maintained a fence around the disposal plant but it had been taken down, the posts pulled up and the post holes filled with dirt. Apparently the first heavy rain since the posts were pulled had fallen shortly before this accident. In driving around the plant and near it and before Manire had arrived at the place where the planned to bury the dog, the truck sank into mud in a post hole. Shaw noticed Manire with the truck stuck in the mud, went to him, and they discussed the best method of getting it out. Shaw then went to Harrell's home and told him of the situation. This was about 6 o'clock in the afternoon. Shaw advised Harrell that he did not think the truck was stuck "very bad." Harrell suggested using another truck to pull the truck out of the mud, and was advised by Shaw that they would need a tractor. Harrell then suggested that it was late and that if the truck was badly stuck it would be better to wait until morning. Shaw said: "I believe with a tractor we could pull it out pretty quick" and Harrell said "Let's get going then." Shaw and Harrell then went to a garage where they told the garage man they wanted to borrow a tractor. They were sent to a mechanic and they told the mechanic, Mr. Jungman, where the truck was stuck and "asked him if he had a tractor to pull it out and if he would let us have it and he said he would." Mr. Jungman picked out the tractor for their use "and then we asked about the chain." Mr. Jungman got a chain "wrapped it around the axle of the tractor and throwed the end of it around the seat." Mr. Shaw asked the mechanic "if it was a regular standard shift" and was told that it was. Harrell told Shaw that he and Manire would meet him at the sewer plant. Shaw drove the tractor to the place where the truck was stuck, handling same without difficulty. There Shaw backed the tractor to the rear of the truck, handed Manire the end of the chain and Manire tied it to the truck. Shaw told Manire to get in the truck and start the motor, throw it in reverse and help pull it

out. Shaw attempted to drive the tractor forward. What happened then is related by Manire as follows: "He [Shaw] made his first pull at this and it seemed that he was trying to regulate his gas or fuel with his hand and when he started to make the first pull he shifted the gears and used the hand feed and it didn't give much power to the tractor and he let out the clutch and it did not move the truck. The wheels turned a little bit and it let the rear wheels of the tractor down a little bit and caused the front end of the tractor to be slightly higher than the rear end; then he released the clutch a second and didn't throw it out of gear and pulled down the throttle a little more and it turned backwards and went over on him."

Harrell testified without contradiction that he made no inspection of the tractor, that he did not undertake to ascertain if it had a drawbar, that he was not familiar with tractors, knew nothing about them, that he did not remember ever seeing a drawbar until after the accident; that he made arrangements for the tractor and sent Shaw to do the work; that he did not know whether this tractor had a drawbar on it or not; that nothing was said by any one about a drawbar.

Mr. Shaw was a mechanic. On the day he was killed he had been working on a broken sewer line and using the truck that was later stuck. There was evidence that tractors of the kind used had, when new, a legible sign on the back reading "Do not attempt to pull when draw-bar is removed. Draw-bar and brace bolts must be kept tight. All hitches must be attached to draw-bar." The only direct evidence on the question was to the effect that the sign on this particular tractor was not legible. There is no evidence that either Harrell or Shaw read the sign, if they could have done so.

The evidence is conclusive that it was very dangerous to attempt to pull a heavy load with this tractor with the chain fastened as it was to the axle and not to a drawbar. The evidence shows that it would have been dangerous to do so with any kind of a tractor, but that with a large and heavy tractor such action would have been less dangerous. The evidence shows that Shaw had experience in the operation of tractors, but not with the particular kind here used. The evidence was to the effect that any one familiar with tractors could tell instantly whether there was a drawbar on it.

The appellant contends first that Shaw, at the time of his death, was engaged in a character of work involving the governmental functions of the city (sanitary work for the public health) and for that reason there is no liability on the part of the city for his death. Second, that the facts show, as a matter of law, that there was no liability upon the part of the city for the death of Shaw, there being no evidence of negligence on the part. of the city, and if there were, the evidence conclusively showing that deceased assumed all risks of whatever injury befell him, and that he was guilty of such negligence himself as to bar recovery.

We will first consider the question of whether or not the city was engaged in a governmental function at the time of the accident. In City of Wichita Falls v. Robison, 121 Tex. 133, 46 S.W.(2d) 965, 966, the Supreme Court of Texas said: "It is well settled by the decisions of this court, as well as by those in other jurisdictions, that sanitation for the public health of a city is a governmental function, and that, when a city is exercising such power, it is not liable for injuries inflicted through the negligence of its officers and employees. Whitfield v. City of Paris, 84 Tex. 431, 19 S.W. 566, 15 L.R.A. 783, 31 Am.St.Rep. 69; White v. City of San Antonio, 94 Tex. 313, 60 S.W. 426; McQuillin on Municipal Corporations (2d Ed.) vol. 6, pp. 775, 776, 784, 785, and 788."

The petition in said case showed that plaintiff was employed by the city in its sanitary department; that plaintiff was required to handle and distribute certain disinfectant powders. That by reason of being required to use such disinfectant, plaintiff, being ignorant of its harmful effect, and not being advised by the city, and the city failing to furnish proper tools and equipment for its use, got the disinfectant in his eyes, which caused him to become blind. It was held that a general demurrer was properly sustained because the petition disclosed that the city was engaged in a governmental function.

In Whitfield v. City of Paris, 84 Tex. 431, 19 S.W. 566, 15 L.R.A. 783, 31 Am.St. Rep. 69, it was held that a city is not liable for damages resulting from the negligence of a person employed by the city council in shooting a dog running at large without a muzzle, in violation of an ordinance, said person being employed for that purpose, because the city was engaged in a governmental function.

In Ballard v. City of Fort Worth (Tex. Civ.App.) 62 S.W.(2d) 594 (writ ref.), it was held that in its operation of a sewer system, which was not operated for profit, a city was engaged in a governmental function, and, therefore, not liable for negligence in failing to provide plaintiff with a safe place to work, etc.

In White v. City of San Antonio, 94 Tex. 313, 60 S.W. 426, it was held that a city is not liable in damages for the negligence or misconduct of its police, acting under orders of its mayor and health officer, in enforcing quarantine regulations.

As bearing on the question generally, see Tompkins, Auditor, v. Williams (Tex.Com. App.) 62 S.W.(2d) 70; King v. City of San Angelo (Tex.Civ.App.) 66 S.W.(2d) 418; City of San Angelo v. Deutsch (Tex. Sup.) 91 S.W.(2d) 308; McVey v. City of Houston (Tex.Civ.App.) 273 S.W. 313.

In City of Wichita Falls v. Lewis (Tex. Civ.App.) 68 S.W.(2d) 388, it was held that the undertaking of the city to supply the offices in its city auditorium with ice was not a governmental function, and that the city was liable for negligence in failing to properly fasten the ice box lid which fell on the janitor's arm and broke it. The Supreme Court granted a writ of error with the notation, among other things, that it was inclined to believe the city was engaged in a governmental function.

Appellees' contention is, as we understand it from their brief, that the city, in picking up a dead dog killed by its marshal in the business district of a city, and carrying it away and burying it, did not engage in a governmental function. In support of this contention appellees cite Ostrom v. City of San Antonio, 94 Tex. 523, 62 S.W. 909; City of Galveston v. Posnainsky, 62 Tex. 118, 50 Am.Rep. 517; City of Longview v. Stewart (Tex.Civ. App.) 66 S.W.(2d) 450; City of Tyler v. House (Tex.Civ.App.) 64 S.W.(2d) 1007; City of Fort Worth v. Wiggins (Tex.Com. App.) 5 S.W.(2d) 761. We do not believe the cited cases control a decision under the facts of this case. We understand the law in Texas to be that a city in cleaning and maintaining its streets and disposing of its ordinary garbage is engaged in a proprietary and not a governmental function. Ostrom v. City of San Antonio, 94 Tex. 523, 62 S.W. 909. The contrary is held in many, if not most, of the states.

Manguno v. City of New Orleans (La. App.) 155 So. 41, 45. Also, that where a city is maintaining a nuisance it is liable for damages, regardless of the question of negligence unless it is engaged in the performance of a governmental function. 43 C.J. § 1734, p. 956; City of Fort Worth v. Wiggins, supra. In City of Ft. Worth v. Crawford, 64 Tex. 202, 53 Am.Rep. 753; Id., 74 Tex. 404, 12 S.W. 52, 15 Am.St.Rep. 840, it was held that if the city in maintaining a nuisance was engaged in the discharge of a governmental function proof of negligence was essential to recovery.

■ The city marshal having killed a dog in the business district, presumably acting in the discharge of his duties, it was incumbent upon the city, as a sanitary measure for the protection of public health, to have the carcass removed and safely disposed of. We consider this a different situation than that which is presented with reference to the individual accumulation of garbage by business houses and individuals, the removal of which is primarily their duty and for their special benefit, which duty may be assumed by the city. We think this conclusion is in accord with the decisions in City of Wichita Falls v. Robison and Whitfield v. City of Paris, supra.

Article 696a, Texas Penal Code, as added in 1927 (Vernon's Ann.P.C. art. 696a), makes it a criminal offense for a municipal corporation to permit a dead animal to remain within 300 yards of a public highway within its limits. The passage of said act was declared to be for the protection of public health. Also, see article 1015, subds. 12 and 15, R.S.1925.

The evidence discloses that Manire's duties were chiefly sanitary. That at times Shaw was engaged in sanitary work, that the truck was used for sanitary and other purposes. On the occasion in question, Manire had not yet reached the spot where the dog was to be buried. He was traveling to and near that place when his truck became stuck in the mud. The dead dog was still in the truck at the time of the accident. It is true, Shaw's interest may have been solely in extricating the truck but nevertheless, under the facts disclosed by this record, we are of the opinion that at the time of his death, the city was engaged in sanitation for the public health, a governmental function, and, therefore, the city is not liable for damages.

We are also of the opinion that appellant's second contention, heretofore stated, must be sustained.

■ It is evident that had the chain been fastened to a drawbar on the tractor the accident would not have happened. Shaw had used a tractor in pulling an old steam engine off the sewer farm to the lake. Shaw and Manire first talked about the best way of getting the truck out of the mud and decided that a tractor was necessary. Shaw suggested the use of a tractor to Harrell. The tractor used was not selected by Harrell. Harrell's action with reference to the tractor was merely to act with Shaw in obtaining the loan of some tractor. Shaw accepted without question the tractor picked out by the garage mechanic, which tractor was stated by him to be in "good shape." It did not have a drawbar on it. A drawbar, such as is ordinarily used on a tractor when a load is pulled, is a large semicircular piece of metal extending out from the rear of the tractor to which the load to be pulled is to be hitched. It is inconceivable from the evidence which discloses the maturity, experience, and mechanical knowledge of Shaw, that he did not know that a drawbar was necessary for pulling a heavy load, and that it was not attached to the tractor borrowed. The only possible explanation of his action is that the "pull" was heavier than he expected.

■ Harrell, the city secretary, was an office man. He knew nothing of tractors. He had never seen (or at least noticed) a drawbar until after the accident. No one was looking to Harrell for information as to the safety of the tractor, or how the work should be done. Harrell helped borrow the tractor and sent Shaw to do the work. Harrell owed no duty to instruct Shaw in the use of the tractor nor to caution him as to the danger because of the absence of a drawbar for the reason that Shaw's knowledge with reference thereto was certainly vastly superior to that of Harrell. Under the evidence Shaw must have known of the dangerous position in which he placed himself.

■ Only ordinary care was required of the city. It was not an insurer of the safety of its employees. As stated, Shaw was familiar with the operation of tractors and machinery generally. He was experienced in pulling a heavy load with a tractor. Harrell had no such knowledge or experience.

Shaw was the person who actually took charge of the work to be done and Harrell was, in effect, the onlooker. Shaw's knowledge with reference to all of such matters was superior to that of Harrell. Under such situation it would have been foolish for Harrell to have instructed Shaw as to the manner of performing the work or to warn him of the danger of pulling the load without a drawbar attached to the tractor. Harrell did not have such information. We think the evidence conclusively shows that Shaw did. Under such situation the appellees are not entitled to recover. Hopkins Bridge Co. v. Burnett, 85 Tex. 16, 19 S.W. 886; Brown v. Brown, 71 Tex. 355, 9 S.W. 261; Houston & T. C. Ry. Co. v. Fowler, 56 Tex. 452. The following statement in Brownwood Oil Mill v. Stubblefield, 53 Tex.Civ.App. 165, 115 S.W. 626, 629, is peculiarly applicable to the facts of this case, and the rule of law announced determinative thereof: "Where the servant has equal facilities with the master for ascertaining the danger incident to the work in which he is engaged, he assumes the risk. Or where the facts show that the servant is of mature years, and that the danger was open to observation to any man of ordinary mental capacity, and equally as apparent to the servant as to the master, there is no duty to instruct or warn the servant. Missouri, K & T. Ry. Co. v. Spellman (Tex.Civ.App.) 34 S.W. 298; Texas & P. Ry. Co. v. French, 86 Tex. 96, 23 S.W. 642; Galveston, H. & S. A. Ry. Co. v. Lempe, 59 Tex. 19; Ft. Worth Stock Yards Co. v. Whittenburg, 34 Tex.Civ.App. 163, 78 S.W. 363, 365, 366. We cannot call to mind any fact, connected with the situation under which the appellee was injured, upon which a man of ordinary intelligence, and with the experience of the appellee, could have been enlightened by instructions from the foreman. It would be a foolish exaction to require the master to impart information which the servant knows before, and an injustice to hold him responsible for injuries resulting from ignorance of situations and danger which a person of ordinary prudence, under the particular circumstances, should have known and avoided." Also, see Arcola Sugar Mills Co. v. Luckey (Tex.Civ.App.) 144 S.W. 1148, 1154, and McCann v. Grider (Tex.Civ.App.) 83 S.W.(2d) 707; 29 Tex.Jur. § 99, p. 179.

■■ We conclude that the evidence fails to show that the city was guilty of negligence, but if we should be mistaken in this conclusion, we are of the opinion that taking into consideration deceased's maturity, knowledge, and experience, he was guilty of contributory negligence, as a matter of law. And, further, that the defect in the tractor (lack of a drawbar) and the danger in the manner in which it was used by the deceased being so obvious that he must have been aware of them, if he exercised any kind of care, we conclude that he is charged with assumption of the risk involved, and for these reasons recovery should be denied. See 39 C.J. §.1051, p. 838; § 1058, p. 843; § 1064, p. 847; § 613, p. 503; § 612, p. 499; 29 Tex.Jur. § 88, p. 157; San Antonio Gas Co. v. Robertson, 93 Tex. 503, 56 S.W. 323; Hilje v. Hettich, 95 Tex. 321, 67 S.W. 90.

■ We recognize the fact that the case presented is one of hardship to a wife and children of a man who has been killed in a bona fide effort to serve the public. The case nevertheless must be decided in accordance with the established rules of law as we understand them. See the opinion of Judge Roberts in Duncan v. Magette, 25 Tex. 245, 254.

The judgment of the district court is reversed, and judgment rendered that plaintiffs take nothing by their suit.

FUNDERBURK, Justice (dissenting in part).

In the writer's opinion this court is not warranted by the evidence in holding, as a matter of law, that Shaw met his death as the result of operations on the part of the City of Munday, of a strictly governmental nature, as distinguished from a proprietary or corporate nature. There are at least two reasons for this view. The act of disposing of the carcass of a dog killed in the city, by taking it to a place near the city's sewerage disposal plant for burial, is not necessarily and primarily referable to the "sanitation for public health" of the city. It is just as reasonably to be regarded as a part of the operations of the city in the removal and disposition of garbage. The courts of this state have adopted the view that the removal of garbage, including the disposition of bodies of dead animals, is a proprietary function. Ostrom v. San Antonio, 94 Tex. 523, 62 S.W. 909; City of Ft. Worth v. Crawford, 64 Tex. 202, 53 Am.Rep. 753; Id., 74 Tex. 404, 12 S.W. 52, 15 Am.St.Rep. 840; San Antonio v. Mackey, 14 Tex.Civ.App. 210, 36 S.W.

760; Stephenville v. Bower, 29 Tex.Civ. App. 384, 68 S.W. 833; 14 A.L.R. 1473. This general view is stated in the note last cited thus: "In some jurisdictions it is held that the cleaning or sprinkling of streets, or the removal of garbage or refuse, is a corporate function *to which the benefit to the public health is a mere incident,* and that a municipality is liable for torts of its employees engaged in such work." (Italics ours.)

The case of Ostrom v. San Antonio, supra, so holding and construing Ft. Worth v. Crawford, supra, to so hold, has often been cited and has never been expressly overruled. City of Waco v. Branch, 117 Tex. 394, 5 S.W.(2d) 498; Goodnight v. Wellington, 118 Tex. 207, 13 S.W.(2d) 353; City of Amarillo v. Ware, 120 Tex.,456, 40 S.W.(2d) 57.

It is more reasonable, I think to construe Wichita Falls v. Robison, 121 Tex. 133, 46 S.W.(2d) 965, as distinguishable upon the ground that the removal of garbage is not referable to sanitation than that with no discussion of the question it was intended to impliedly overrule said former decisions.

But, even if such act was a part of the sanitary measures of the city, the facts do not show, at least not conclusively, that such was the enterprise in which Shaw met his death. A city truck was stuck in the mud. Shaw's connection with the transaction had to do only with getting the truck out, which had no necessary relation to the events leading up to the truck's becoming stuck in the mud. Surely, the city had a proprietary interest in getting the truck out of the mud wholly independent of the fact that there was a dead dog in it. The truck was out at the sewerage disposal plant. The occasion of its being there was its use in hauling the carcass of a dead animal. The City of Munday had the duty and responsibility of retrieving its property. That was the work which the city was doing by and through its servant Shaw when the tort, if any, was committed.

If the operation in which the city was engaged was not exclusively proprietary, neither was it exclusively governmental. Is it pertinent to inquire what is the governing principle of law where an alleged tort is committed while it is not referable exclusively to governmental operations or proprietary operations, but to both? We think immunity from liability existed, if at all, because the operations were *strictly* governmental and *solely* for the public ben-

efit. City of Amarillo v. Ware, supra; City of Fort Worth v. Wiggins (Tex.Com.App.) 5 S.W.(2d) 761; Ostrom v. San Antonio, supra; White v. City of San Antonio, 94 Tex. 313, 60 S.W. 426; City of Galveston v. Posnainsky, 62 Tex. 118, 50 Am.Rep. 517.

A discussion of the authorities dealing with this question are to be found in a note in 64 A.L.R. 1546, wherein it is said: "That a municipality or county may be liable in damages for a tortious injury in or about a building which is used for both governmental and proprietary functions is shown by the following cases," citing and discussing the cases. In the case under which the note appears it is said: "The fact that some of the activities centered in this building are exclusively of a purely governmental nature will not affect liability, when they are joined with business activities." Bell v. City of Pittsburgh, 297 Pa. 185, 146 A. 567, 568, 64 A.L.R. 1542.

It is, therefore, my view that the judgment of the court below should be affirmed but for the further conclusion that as a matter of law no negligence was shown, or some defense was exclusively established.

The negligence relied on for recovery was (1) failure to warn; (2) failure to furnish Shaw with safe tools and appliances; and (3) failure to furnish him with safe premises to work upon.

As to the first ground of negligence there could be no recovery under the evidence because it shows conclusively that Harrell, the representative of the city, had no actual knowledge of the danger. In the absence of such knowledge there could be no negligence based alone upon a failure to give warning of such danger. This would seem to be elementary.

There was neither pleadings nor evidence to sustain a recovery on the ground of a breach of duty on the part of the city to furnish Shaw a safe place to work. It was alleged that it was the "duty of the city of Munday to furnish the said William Shaw a safe place and premises upon which to work; that the said defendant failed to do this, but allowed open holes to remain upon its premises which became filled with water and mud in such a manner that its trucks were unable to cross same in a safe way and manner and for the failure to so keep its premises free and clear of all hazards the defendant herein was guilty of negligence," etc. It makes no difference what character or degree of negligence on

the part of the city, if any, may have been the cause of the truck becoming bogged in the mud, the city had the right to use its servants and agents to get it out. The causes of the truck becoming stuck in the mud could not possibly be a proximate cause of the death of the servant whose only relation to the transaction was an effort as an employee of the city to get it out of the mud. There was a total absence of any continuing effect of the causes of the truck becoming stuck. The assertion of this ground of negligence was precisely the same as would have been a contention that the defendant was negligent because it required Shaw to get the truck out of the mud, the only alternative to which would have been to abandon the truck, at least temporarily. It should require no citation of authority to show that no recovery could be based upon such a theory under the undisputed facts.

The only other question is: Was there evidence to raise an issue of fact that the city was guilty of negligence in requiring or permitting Shaw to endeavor to pull the truck out of the mud with a tractor not equipped with a drawbar? There is no evidence to suggest any other defect in the tractor than the absence of a drawbar. That was not a defect per se, but only became so, if at all, by reason of the manner of its use. The absence of a drawbar from the tractor, if regarded as a defect, and the danger in the use of the tractor without a drawbar, if that was the cause of the injury, were just as open and obvious to Shaw as to the City of Munday, or its representative. Shaw was a mechanic and had had experience with tractors. The representative of the city was not a mechanic and had had no experience with tractors. The fact that Shaw had never used a Farmall tractor could be of no controlling importance, since the undisputed evidence showed that the danger was one applicable to the use of all tractors, varying only in degree. For aught any evidence shows to the contrary, Shaw was as much the representative of the city in selecting the means of getting the truck out of the mud as was Harrell, the city secretary. If the city was guilty of negligence, Shaw was guilty of negligence. Under the undisputed evidence the city had no better means than Shaw had of recognizing the danger from which the injury resulted. Certainly, under the undisputed facts the city was under no greater duty to protect Shaw from the result of conditions as open and obvi-

ous to him as could possibly be to the city, than Shaw himself was. Particularly is this true where, as we think the evidence conclusively shows, the city was relying upon Shaw's superior experience and knowledge.

Granting the general rule that the master is under a positive and nondelegable duty to furnish the servant with reasonably safe appliances, it is equally certain "that it is nevertheless competent for the master to impose on, and for the servant to accept, by contract or mutual understanding, the burden of inspection, examination or even in some cases the maintenance, of the appliances or places he is required to use, such as he is competent to make." 39 C.J. 324, § 446; Payne v. Robey (Tex.Com.App.) 257 S.W. 873; Texas City Transp. Co. v. Winters (Tex.Com.App.) 222 S.W. 541; Pruitt v. Frost-Johnson Lumber Co. (Tex.Civ. App.) 161 S.W. 421; Maughmer v. Behring, 19 Tex.Civ.App. 299, 46 S.W. 917.

The writer, while disagreeing with the majority opinion upon the first question, concurs with it in the holding on the other question of liability, which alone requires that the case be reversed and judgment rendered for the defendant.